GEORGE H. STEUART, *Executor of* WILLIAM STEUART, *vs.* JOHN CARR, RICHARD L. STOCKETT AND JOSEPH N. STOCKETT.—*June,* 1848.

A suit in Chancery abated in 1838, by the death of the defendant. The bill of revivor was not filed until 1843, and to account for the delay, it was alleged and proved that the original papers were lost or mislaid in the Chancery office, from July, 1838, to September, 1843 ; that frequent searches were made for them without effect, by the register and solicitor of the complainants, and that the bill of revivor was filed as soon as they were found. *Held,*

That the plea of limitations, founded upon this lapse of time, would not, under these circumstances, bar the revival of the suit, even if under ordinary circumstances, such a defence would in equity be available.

When an executor fails to give the notice to creditors to exhibit their claims, required by the 13th section of the 8th sub-chapter of the act of 1798, ch. 101, he will not be entitled to the exemption from liability, provided for in the 15th section of the same sub-chapter of the same act.

And if an executor departs from the due course of administration, by paying legacies, after he has acquired knowledge of the claim of a creditor, he will not be exempt from liability for such claim, even though he had previously given the requisite notice to creditors.

Before certain legacies became due and payable under the will, the executor and his co-residuary legatee entered into an agreement in writing, under seal, by which they bound themselves to pay interest on said legacies, semi-annually, from the time they became due until paid; the principal to be paid by the executor in due course of administration. *Held,*

That such a contract cannot impair, destroy or change the rights or priorities of other creditors or legatees, arising under a due course of administration, even if it should be regarded as expressly binding the obligors to pay the legacies therein mentioned.

Whilst an executor acting in the faithful discharge of his duties, will receive the favor and protection of a court of equity, yet if he enters into a covenant, either for his own benefit, or that of him with whom he contracts, by which he binds himself personally for the payment of a debt or legacy, which with the assets then in his hands, and in due course of administration he was not then in a condition to pay, he must take the consequences of his own gratuitous act.

The 2d section of the act of 1823, ch. 131, which places creditors whose claims are known to the executor, but who fail to bring them in, in pursuance of notice given, as required by the act of 1798, upon the same footing with those whose claims are unknown, was never designed to apply to cases where notice to the executor or administrator has been given through the medium of a *lis pendens,* or been in due time followed by it.

In many cases, the authentication of claims in the particular mode required by

the acts of Assembly, is impracticable; the only alternative of the creditor being a resort to a court of justice;—a literal construction, therefore, of the act of 1823 would be fraught with inconsistency and injustice, and will not be placed upon it, if it be susceptible of any other just and rational interpretation.

APPEAL from the Court of Chancery.

The original bill in this case, was filed on the 18th July, 1832, by the appellees against *Geo. H. Steuart*, the appellant's testator and others, alleging the death of one *Richard Watkins*, in the year 1794, seized of a certain tract of land in *Anne Arundel* County, called "*Bessington*," containing one hundred and fifty acres, more or less, leaving a last will and testament whereby he devised said land to his three sons, *Joseph, Richard* and *Nicholas*, for life, but made no disposition of the reversion or remainder, after the termination of said life estates, whereby the same descended to the heirs of the testator generally, who were the said three sons, and also three daughters. The bill then states the transfer of the interest of said *Richard*, the son, and of certain other parties, in said land, to the complainant, *Carr*, and the deaths of the other sons and daughters of the testator, leaving numerous children, who are particularly named, many of whom are minors, and their respective interests in the said land stated, and then charges that said *Wm. Steuart* is, and has for a long time been in possession of a part of this land, enjoying the rents and profits thereof, and refusing to account for the same or to give it up to those entitled; that it would be for the benefit of all the parties interested, to have the same sold and the proceeds divided according to their respective rights, and then prays for a sale, and for an account from *Steuart*, for rents and profits of the land held by him.

Exhibit A, is the will of *Richard Watkins*, the elder, and contains, among others, these clauses:—

" *Item.* I give and bequeath unto my son *Joseph Watkins*, all that part or parcel of land called ' *Bessington*,' lying over the main road and adjoining the land he bought of *Thomas Stockett*." " *Item.* I give and bequeath unto my two sons *Nicholas Gassaway Watkins* and *Richard Watkins*, all that

part or parcel of land, called '*Bessington*,' lying on the south east of the main road leading to *South River Church*, to be equally divided between them at the death of my wife."

Other exhibits are also filed with the bill, consisting of deeds and judgments and other evidences of title in the complainants, to which it is not necessary to refer.

*The answer of Wm. Steuart*, filed on the 17th May, 1834, after admitting the death of *Richard Watkins*, the elder, leaving said will, and the devises to his three sons therein contained, proceeds to state that this defendant is advised to admit, that by virtue of said will the said sons acquired estates for their respective lives in the property thereby devised to them. But insists that at the time of the death of the testator, and from thenceforth until after this defendant had acquired an interest in the lands, it was supposed that said will vested in said sons estates in fee simple in said lands. That many years ago, said *Nicholas Gassaway Watkins* assigned all his interest in said lands to said *Joseph Watkins*, believing he was assigning, and said *Joseph* believing he was purchasing an estate in fee simple, in an undivided moiety of the lands so devised to said *Nicholas* and *Richard*; that after holding said lands in common for some years, they agreed to make partition thereof, between them agreeably to a plat filed with the answer, the said *Joseph* taking for his part the lot containing fifty acres, and said *Richard*, the lot containing seventy-two and a half acres; that after said petition, defendant purchased all the interest of said *Joseph* in all said lands mentioned in his father's will, as by a conveyance from *Solomon Groves*, late sheriff of *Anne Arundel* County, to defendant, filed as part of this answer will appear. Defendant relies on said deed as vesting in him all the right and title of said *Joseph*, as devisee and heir-at-law of his father, and as assignee of said *Nicholas G.* and all other his rights, titles and interest in and to the lands mentioned in and conveyed by said deed. Defendant further states that after he had thus acquired title to, and possession of said lands, he entered into an agreement with said *Richard*, which was consummated, by the execution of two deeds of exchange, filed with the answer whereby

defendant conveyed to said *Richard* the lot of fifty acres, and the latter conveyed to defendant said lot of seventy-two and a half acres, and defendant now and for years past, has been in the possession of the lands so claimed by him. He admits the death of the said *Joseph* and *Nicholas G. Watkins,* and that the bill correctly states the condition of their families, but does not admit that the children or representatives of the said *Nicholas,* have any interest whatever in any part of the said lands, nor that the children of said *Joseph* have any interest in the lands which were devised to him by his father, or in any part of the lands claimed by defendant.

The deed from *Solomon Groves,* the sheriff, to *Wm. Steuart,* the defendant, referred to in the answer and filed with it as Exhibit No. 2, is dated the 23d April, 1818, and recites that writs of *fi. fa.* had been issued upon certain judgments recovered by *Richard Mackubbin* and the *State of Maryland,* against said *Joseph Watkins,* in the years 1800 and 1802, and levied upon a certain tract of land situated in *Anne Arundel* County, called " *Bessington,*" the property of said *Watkins,* and that by virtue of writs of *venditioni exponas,* afterwards thereon issued, the said sheriff on the 22d November, 1817, sold the said lands to *Wm. Steuart,* for the sum of $3,010, and then conveys " unto him, the said *Wm. Steuart,* his heirs and assigns, all the right, title and interest of the said *Joseph Watkins,* in and to that part of a tract of land called ' *Bessington,*' in which the said *Joseph Watkins* had a *fee simple,* so as aforesaid taken on the writs of *fieri facias,* containing eighty-three and three-quarter acres of land," "also all the right, title and interest of the said *Joseph Watkins,* in and to that part of a tract of land called ' *Bessington,*' so as aforesaid taken on the writs of *fieri facias,* which lies on the north side of the main road leading from *South River* Church to *Rawlings' Tavern,*" containing thirty-eight and a quarter acres of land, "also all the right, title and interest of the said *Joseph Watkins,* in and to that part of a tract or parcel of land called ' *Bessington,*' so as aforesaid taken on the writs of *fieri facias,*" " the same being the second lot or parcel of ' *Bessington,*' the part alloted to the said *Joseph Watkins,*

55    v.6

agreeably to a division made between the said *Joseph Watkins* and a certain *Richard Watkins* by *Thomas H. Hall* and *John Iglehart, Jr.*, authorized and appointed by the said *Joseph* and *Richard*, to divide that part of the tract or parcel of land called ' *Bessington*,' agreeably to the will of their father, beginning at the end of the first line of the first lot allotted to the said *Richard Watkins*, running, &c., containing fifty acres of land more or less."

On the 7th May, 1834, a decree was passed for the sale of the said lands without settling the rights of the parties to their respective shares of the purchase money, with the understanding between the solicitors of the parties that such decree should not prejudice the claim of the complainants against the defendant for an account of rents and profits.

The sale was made and confirmed, and the proceeds brought into court, a mass of testimony was then taken in reference to the sheriff's sale of the estate of *Joseph Watkins*, and the time the land was occupied by *Steuart*, its value, &c., which it is not material to state, and on the 30th April, 1838, the Chancellor (BLAND) passed the following order:

" Ordered, that this case be, and the same is hereby referred to the auditor, with directions to state an account from the pleadings and proofs now in the case, distributing the proceeds of the sale of the real estate among the parties, according to their respective interests. In stating this account, the auditor will assume that under the will of *Richard Watkins*, deceased, his three sons took only a life estate in the land, in the proceedings mentioned, leaving the fee simple thereof, to descend to all his children and heirs equally. That his son, *Joseph Watkins*, being entitled to one specified third of the land for life, and to one undefined sixth part of it by descent, acquired another third for life, and one other sixth part by purchase, which interest of *Joseph's* was sold under a *fieri facias*, and bought by the defendant, *William Steuart*. That the defendant, *John Beard*, by his mortgage and the judicial proceedings thereupon, acquired the life interest of *Richard Watkins*, and nothing more. That the plaintiff, *John Carr*, as assignee of

the purchasers, under the *fieri facias,* against the estate of *Richard Watkins,* is entitled to his interest, not covered by the mortgage to *Beard,* and that *John Carr,* is also entitled as assignee of the other claimants as stated in the bill. The defendant, *William Steuart,* must be held accountable for the rents and profits, according to the actual value of the property, to the other parties, entitled to such portions of it as may have been held by him, from the time when their rights may have respectively accrued up to the day of sale. But there being no evidence of any demand of dower having been made of *William Steuart,* the purchaser, by the widow of *Joseph Watkins,* deceased, she is not entitled to any rents and profits from him."

The auditor then stated an account C, assigning two-thirds of the net proceeds of sale to *William Steuart,* the defendant, which was affirmed by order of the Chancellor on 12th June, 1838.

The auditor afterwards, on the 5th July, 1838, states several accounts of rents and profits, by the last of which (account F,) the defendant, *William Steuart,* is charged with the sum of $954 90, being the annual valuation of two-thirds of the real estate of *Richard Watkins,* deceased, up to the 2d June, 1834, which is awarded to the parties entitled. The defendant on the ninth of the same month, excepted to these accounts of the auditor.

At September term, 1843, the complainants filed a bill of revivor, in which, after stating the above proceedings, up to the exceptions taken to the auditor's account on the 9th July, 1838, they charge that the said papers were mislaid for many years. That before the cause was brought to final hearing, the said *William Steuart* departed this life, leaving a last will and testament, whereof he appointed a certain *George H. Steuart* executor, who has obtained letters testamentary thereon, and has possessed himself of assets of his testator sufficient to answer the demands of your orators, as stated in their original bill. The bill then prays that the suit may be revived, and in case the said executor shall not admit assets of his testator

in his hands, to satisfy the said demands, that an account may be taken under the directions of this court, of the estate and effects of the said testator received by him as executor, &c.

The *answer of* the appellant to this bill of revivor, was filed at March term, 1844, and after admitting the proceedings upon the original bill, as far as the statement of the auditor's accounts, of the 5th July, 1838, and the filing of exceptions thereto by his testator, and other parties, avers that these exceptions were not regularly filed, there being no official endorsement upon the papers, purporting to be such exceptions. Respondent does not admit, (and avers he has no knowledge of the fact,) that the papers in the cause were mislaid for many years, as alleged in the bill, or that they were mislaid for any period of time, and even if such was the fact, he contends it was no fault of his, and he cannot in any manner be held responsible, or be affected by this circumstance, in which he had no agency or privity, and which, for aught that appears to the contrary, may have been caused by the acts or neglect of complainants, or of their agents and solicitors, who had the privilege of withdrawing the papers from the office of the register of this court, and may have done so, and this caused them to have been mislaid. He admits the death of *Wm. Steuart* in October, 1838, leaving a will, and the appointment of respondent as executor. That he has assumed this trust, and in virtue thereof, has possessed himself of assets to a large amount, exceeding the claim of the complainants and other parties to this suit: but he denies that they are entitled to revive, or to maintain this suit against him; for he avers that his testator informed him shortly before his death, that he had made a settlement of the case, and had fully and finally closed the same, by agreeing to take to himself a certain proportion of the proceeds of sale. That such was the impression of respondent, both before and after the death of his testator, and until a short time before the filing of this bill of revivor, when he was informed, greatly to his surprise, that the complainants were still contending and hoping to make testator's estate liable for the rents and profits, so as aforesaid claimed by them.

Respondent states that more than five years have elapsed since the death of the testator and the taking out of letters testamentary by respondent, and that during that time, and before any claim was made on him by complainants, he has paid, or secured to be paid, debts and legacies of his testator to a larger amount than all assets, real and personal, that have come into his hands, liable for debts and legacies; and consequently, complainants have brought forward their claims too late— the entire assets having been exhausted. That he has paid to his co-residuary legatee under the will of said *Steuart*, more than $3,000 for his moiety of the supposed residue after payment of debts and legacies, whereas, there will be no residuum at all. The answer then pleads and relies upon the act of limitations, as a bar to the claim of the complainants; and also the plea of *plene administravit.*

A commission was then issued to take testimony, under which it was proved by the register and solicitors of the parties, that the papers in this case were lost or mislaid early in July, 1838, and were not found until September, 1843, when the bill of revivor was immediately filed. That repeated searches had been made for them by the register, and frequent efforts to find them by the solicitor of the complainants. That when found, the exceptions of complainants and others to the auditor's accounts of rents and profits, were found among them, with the agreement to submit the cause to the Chancellor on the part of the complainants; but none of these papers were marked " filed," by reason of their loss.

On the part of the defendant, the will of his testator, the inventory of the estate, and his various administration accounts passed by the Orphans court, were exhibited and filed, and also the following agreement under seal :—

" The last will and testament of *William Steuart*, late deceased, of *Anne Arundel* County, having devised to his executor, *George II. Steuart*, certain property in trust for payment of debts and legacies, (a considerable part of which property remains unsold, and no more of which is yet sold than will be required to pay debts,) and the two years allowed the exe-

cutor for making said sales, not expiring until about the 31st of October next. The undersigned, residuary legatees under said will, believing that the fund so devised in trust will be sufficient to pay the debts of testator, and the legacies of $5,000 each, to their three sisters, *Sophia E. Delprat*, *Henrietta Thorndike*, and *Elizabeth Calvert*, and to their nephew, *Henry Latrobe*, and desiring that said legatees should enjoy the benefit designed for them by the testator, do hereby agree and bind themselves, jointly and severally, to pay legal interest on said legacies, commencing on the 31st day of October next, semiannually; that is to say on the 1st of May and 1st of November, in each and every year, until said legacies shall be paid off; the principal of said legacies to be paid by the executor, in due course of administration, out of the funds coming into his hands, whereon said legacies are chargeable; the said *Sophia*, *Henrietta* and *Elizabeth* to be successively paid out of the monies first received by the executor, in the order they may agree upon; or if they fail to point out the order in which said legacies are to be paid, then the executor to pay them off equally, share and share alike, (reserving *Henry Latrobe* for the last,) and whenever partial payments are made on account of either of said legacies, a proportional deduction to be made from the semi-annual payment of interest herein provided for. It is to be understood, however, and it is hereby distinctly averred by the undersigned, that nothing herein contained is to commit them to the payment of interest or principal of any other legacies than those above-mentioned, it being at this time uncertain whether the legacy fund will be sufficient to cover legacies which are made payable after those above-mentioned. Witness our hands and seals this 11th day of June, 1840.

G. H. STEUART, [*Seal.*]<br>
R. S. STEUART, [*Seal.*]

Witness, *James Steuart.*"

The last administration account of the executor, passed on the 19th April, 1844, and also filed under the commission, shows the payment, by the defendant, of three of these legacies

of $5,000 each, on the 22d February, 1844, after the filing of the bill of revivor and return of the subpœna issued thereon.

On the 25th day of July, 1846, the Chancellor (BLAND) "ordered and decreed that the said account F, as stated by the auditor and returned as part of his report, filed on the 6th July, 1838, be and the same is hereby ratified and confirmed, all exceptions to the same at variance to this decree, being hereby overruled," "and it is further adjudged, ordered and decreed, that the defendant, *George H. Steuart*, executor of *William Steuart*, deceased, pay, or bring into this court to be paid unto the said heirs of *Richard Watkins*, deceased, the said sums of money so by the said account F respectively awarded to each of them, amounting altogether to the sum of $954 90, lawful money, with interest on $717 79, part thereof, from the 2d day of June, 1834, until paid or brought in, together with costs, &c."

From this decree, the defendant appealed to this court.

The cause was argued before DORSEY, C. J., MARTIN and FRICK, J.

By GEORGE H. STEWART for the appellant, and

By RANDALL for the appellees.

DORSEY, C. J., delivered the opinion of this court.

To the bill of revivor filed in this case, the appellant hath set up in his answer, three distinct defences. The first is, that he "avers that his said testator informed him within a short time before his death, that he had made a settlement of the above-mentioned case, and had fully and finally closed the same, by agreeing to take to himself a certain proportion of the proceeds of sale." As this statement of a settlement is not responsive to any of the allegations contained in the bill of revivor, and is utterly irreconcilable to the whole tenor of the proceedings in the Court of Chancery, in the life-time of the appellant's testator, we are at a loss to discover how such a communication made by the testator to the appellant, could in

any case, much less in this, interpose the slightest obstacle to the relief sought against the appellant.

The second defence relied on in the appellant's answer, is the plea of limitations, grounded on the lapse of time inter-- vening between the abatement of the suit by the testator's death, and the filing of the bill of revivor. Without inquiring. whether, under any ordinary circumstances, such a lapse of time would present an absolute bar to the revival of the suit, or recovery of the claim of the appellees; we are of opinion, that the statements in the bill of revivor, in relation to the loss of the original papers in Chancery, sufficiently account for the delay attending the filing of the bill, and that to deny to the appellees, under the circumstances of this case, their right of reviving their suit, and recovering their claim on the ground of the lapse of time complained of, would be unjust and in-equitable, and therefore should not be sanctioned by a court of equity, even conceding such a defence were there otherwise available.

The third defence is *plene administravit*, by the executor, the appellant. In support of this plea, the appellant hath produced. a variety of testimony, and all his administration accounts set-tled with the Orphans court, by which his letters testamentary were granted. If the executor had done all that the law re-quires, as a protection to him in the payment of debts and lega-cies; and the payments for which allowances have been made to him by the Orphans court, had been made in the due and regular administration of the assets of his testator, and with-out the appellees having communicated to him their claim in the mode prescribed by law, he might, with some degree of confidence, have relied on his plea of *plene administravit*. But unfortunately for him, he stands in no such attitude. It no where appears in the record before us, that he gave the notice to credi-tors to exhibit their claims, as required of him by the 13*th sec. of the* 8*th sub-chapter of the act of* 1798, *ch.* 101,—and conse-quently, is entitled to none of the protection otherwise extended to him by the 15*th sec. of the same sub-chapter* of the same *act of Assembly.* But suppose it were conceded that the executor

had given to the creditors of the testator the requisite notice to exhibit their claims, is he then entitled to the exemption from liability for the claim of the appellees, of which he seeks to avail himself by his plea of *plene administravit?* We think not. The executor has not, in the due course of his administration, made all the payments to legatees, for which he has been allowed by the Orphans court, before he acquired a knowledge of the claim of the appellees. But, on the contrary, several of such payments, far exceeding in amount the subject of the present controversy, were made by him after the subpœna issued on the filing of the bill of revivor, had been served upon him: and it is apparent upon the face of the last of the appellant's accounts passed by the Orphans court, that such payments were made by the appellant out of assets which came to his hands, after service of process to compel his appearance to the bill of revivor, filed against him by the appellees.

But it is insisted, that these payments of the four legacies of $5,000 each, must, notwithstanding, have priority over the claim now before us, because the appellant and his co-residuary legatee, more than four months before those legacies were payable, under the testator's will, by an instrument of writing, under their hands and seals, had bound themselves for the payment, semiannually, of interest on the legacies, from the time they became due until paid; "the principal of said legacies to be paid by the executor, in due course of administration, out of the funds coming into his hands, whereon said legacies are chargeable." That these co-residuary devisees lost nothing by such an agreement, is manifest; because, in the absence of any such agreement, interest on the legacies from the time they became payable, must have been paid out of the residuum of the testator's estate bequeathed to his two residuary devisees. That said residuum was of value, is apparent from the executor's last account, in which he obtains a credit for $3,000, as paid in full for his brother, *Richard S. Steuart's* share of the residue of the testator's estate, meaning of necessity, after payment of all debts and legacies. That this agreement was entered into

by the residuary legatees for their own benefit, nobody can doubt who reads the record now before us.

What possible influence this agreement can have upon this case, we are unable to comprehend. It is not intimated that any conflict has arisen or can arise between the appellees, who prefer the present claim and the residuary legatees for interest paid· by them under the agreement.

For the payment of the four legacies in question, the only responsibility assumed under the agreement by the executor and his co-residuary legatee, was that " the principal of said legacies to be paid by the executor in due course of administration, out of the funds coming into his hands, whereon said legacies are chargeable." Against this stipulation, the appellees have sought nothing; they are perfectly content that the assets in the hands of the executor, should have been applied accordingly. Of the claim of the appellees, the executor was fully notified before the payment of those legacies, and before his receipt of the assets, wherewith the legacies were paid. What then was the executor's duty? What " the due course of administration" of the funds thus coming to his hands? Certainly, to pay the debts first, and then apply the balance in his hands to the payment of legacies. But this, the natural order of things, the appellant seeks to pervert, and to give to legatees that priority of payment always heretofore conceded to creditors. For such an innovation, no authority has been attempted to be referred to, and it is believed that none can be found. In determining on the validity of the plea of *plene administravit*, the existence of the creditor's debt is admitted.

But suppose we are wrong, (which appears to us impossible,) in the construction we have given to this agreement, and that in express terms, it personally bound the appellant and his co-obligor for the payment of the aforesaid legacies, it would not, in the slightest degree, change the opinion we have expressed. Whilst an executor, acting in the faithful discharge of his duties, and in the due course of administration of the assets of the deceased, will have extended to him every favor and protection

which it is in the power of a Court of Chancery consistent with equity and justice to confer; yet, when an executor, departing from the line of his duty, enters into a contract by which, whether for his own benefit, or the benefit of him with whom he contracts, it matters not which, he binds himself personally for the payment of a debt or legacy, which with the assets then in his hands, and in a due course of administration, he was not then in a condition to pay, he must take the consequences of his own gratuitous act, and abide the result: all he can ask or expect at the hands of a court of equity, is that he may be permitted to assert the rights of the creditor or legatee with whom he contracted, in the same manner as if such contract had never been entered into. To impair, destroy, or change the rights or priorities of other creditors or legatees, arising under a due course of administration of the assets of the testator, such a contract cannot have the slightest operation, or with the consequences imputed to it, be countenanced for a moment by a court, either of law or equity. The unjust and fraudulent consequences that would probably result from the toleration of such a power in the hands of an executor, are so obvious to the mind of every lawyer, that to give examples or illustrations of the manner in which they might be produced, would be a useless waste of time.

As another and independent bar to the appellee's right to recover, the appellant relies upon the 2d section of the act of 1823, ch. 131, by which it is enacted, " that in all cases where a claim or claims against a deceased person's estate, shall be known to the executor or administrator of such estate, and such claimant or claimants shall delay, neglect or refuse to bring in his, her or their claim or claims legally authenticated, after notice given as directed in the thirteenth section of the eighth chapter of the act to which this is an additional supplement, and within the time limited in such notice, such claimant or claimants shall be in the same situation to all intents and purposes with regard to his, her or their claims, as those whose claims are unknown to the executor or administrator, any thing

contained in the original act, to which this is an additional supplement, to the contrary notwithstanding."

The only answer that need be given to this new ground of defence, is that this section of the act of Assembly, never was designed to apply, and by the judicial tribunals of the State never has been held as applying to cases where the notice to the executor or administrator has been given through the medium of a *lis pendens* or been in due time followed by it. Numerous cases must arise and have arisen where the authentication of claims in the particular mode prescribed by the acts of Assembly was impracticable, and for the recovery of which, resort to a court of justice was the only alternative left to the creditor for the recovery of his claim. If the act of 1823, is to receive the literal construction now contended for, it would be in the power of the executor or administrator, on almost every estate to prevent any judgment or decree being rendered against them, by making a final distribution of the estate pending the litigation. And a creditor might be, in like manner, defeated, if pending a suit in Chancery against the executor or administrator in whose exclusive knowledge rested the existence and justice of the claim, a final distribution of the deceased estate were made, although at the time of the distribution, the executor or administrator well knew that nothing was wanting but the filing his own answer in Chancery, (which in a few days he must be compelled to file,) conclusively to establish the creditor's claim. A construction fraught with such inconsistency and injustice is never to be imposed upon an act of the legislature, if it be susceptible of any other just and rational interpretation.

The decree of the Chancellor appealed from in this case, is hereby affirmed with costs; and the cause is remanded to the Court of Chancery, that such further proceedings may be had in relation thereto, as shall be necessary to secure to the said appellees the full benefit of the said decree and the affirmance thereof by this court.

**DECREE AFFIRMED AND CAUSE REMANDED.**